Filed 6/17/22  In re Angela R. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Angela R. et al., Persons Coming Under the Juvenile Court Law. | B312951 |
| _____ | (Los Angeles County Super. Ct. No. 19CCJP05694A–B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| Demi R. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

William H. Hook, under appointment by the Court of Appeal, for Defendant and Appellant Demi R.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant Richard R.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

———————————————

Demi R. (mother) and Richard R. (father) appeal from orders of the juvenile court terminating parental rights to their twin children, Angela and Richard, Jr. The parents contend the juvenile court erred by finding that the Los Angeles County Department of Children and Family Services (DCFS) adequately investigated the children's possible Indian ancestry, as required by the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related state statutes. We find no error, and thus we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Detention, adjudication, and disposition.

Angela and Richard were born in August 2019. Both children tested positive for amphetamines and heroin at birth and experienced symptoms of withdrawal thereafter. Mother reported being homeless and using drugs daily during her pregnancy. Father disclosed a prior gang affiliation and an extensive criminal history related to drug use.

Two days after the children's birth, mother discharged herself from the hospital against medical advice. Neither mother nor father left an address or any contact information other than cell phone numbers. A children's social worker (CSW) tried to

2

contact both parents the following day, but the parents had their phones turned off and did not return the phone calls.

DCFS obtained an expedited removal order for the children when they were three days old. Upon their release from the hospital, the infants were placed with foster parents who continued to care for them throughout these proceedings and are the prospective adoptive parents.

DCFS filed a dependency petition in September 2019. The petition alleged that mother's use of illicit drugs while pregnant with the children and the parents' substance abuse placed the children at serious risk of physical harm (Welf. & Inst. Code, § 300, subd. (b)).[1] On January 31, 2020, the juvenile court sustained the allegations of the petition, ordered the children removed from mother and father, and ordered reunification services for both parents.

In July 2020, DCFS reported that it had had only periodic contact with the parents. Contact had been difficult because the parents' telephone number had changed at least four times over the preceding ten months and the parents did not have permanent housing. Mother periodically called the CSW to report that she was participating in programs, but she was never able to provide contact information for the programs and did not respond to the CSW's attempts to follow up. The parents routinely failed to show up for scheduled visits with the children, and neither parent ever appeared for a drug test.

---

[1] All subsequent undesignated statutory references are to the Welfare and Institutions Code.

DCFS reported in June 2021 that the parents had last visited the children in November 2020 and last called the foster parents in April 2021.

## B. ICWA inquiry.

### 1. Inquiry as to father.

A CSW interviewed father in late August 2019, when the children were two days old. Father said he was the oldest of four children and that his father had died when he was six years old. The CSW asked whether father had any family with whom the children could be placed, and father provided the names of his mother and stepfather, whom he said lived in Arizona. Father did not have his parents' contact information, but he said he would ask them to call the CSW. They did not do so. Father also said he had two daughters with his former wife but he did not have an address or phone number for them.

On August 30, 2019, DCFS filed an ICWA-010 form, signed by the CSW under penalty of perjury, stating he had interviewed father in person, and father "denied any known Indian ancestry."

Father, but not mother, appeared at the September 5, 2019 detention hearing. Prior to the hearing, father filed and signed an ICWA-020 form in which he said, "I have no Indian ancestry as far as I know." The court asked father whether his statement denying Indian ancestry was correct, and father said it was. The court then asked whether father knew if mother had Indian ancestry; father did not. Based on father's response, the court found that ICWA did not apply, but said it would revisit the issue once mother was arraigned.

The CSW interviewed father again in October 2019. Father said he was close to his mother, grandmother, and three living

4

siblings, but he was able to provide contact information for only his grandmother (the children's paternal great-grandmother). When the CSW attempted to call the paternal great-grandmother, however, the number was inoperable. The CSW said he would inform the court if he was able to obtain any additional contact information.

The CSW tried to contact father on January 23, 2020, but father did not respond. The CSW had only sporadic contact with father thereafter.

### 2. Inquiry as to mother.

Mother refused to speak to the CSW while she was in the hospital and then discharged herself on August 29, 2019, when the children were two days old. The CSW tried to contact mother several times in October 2019, but mother's number no longer was in service. In late October 2019, DCFS reported that mother's whereabouts were unknown. On October 28, 2019, mother left a message for the CSW providing her new phone number, but the CSW was not able to reach mother at that number.

Mother appeared in court for the first time on December 11, 2019. Prior to the hearing, mother signed an ICWA-020 form stating that she might have Indian ancestry through a Cheyenne tribe. Mother did not check the boxes on the form indicating that she or the children "[are] or may be . . . member[s], or eligible for membership in, a federally recognized tribe," or that "[o]ne or more of [her] parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe."

At the December 11, 2019 hearing, the court asked mother whether she or any member of her family was a member of a Cheyenne tribe. Mother said she did not know, but she believed

5

she had Cheyenne ancestry through her father's grandmother (the maternal great-great-grandmother). Mother did not know the great-great-grandmother's name or whether she was still alive. Mother said her father's name was Jerry Ruiz and he lived in Los Angeles "last I heard." However, mother was not in touch with her father and did not know his phone number, address, or date of birth. The court then asked whether there were any other relatives who might have information about her family's ancestry, and mother said there were not. The court asked mother to try to get contact information for any relatives who might know about her family's Indian ancestry and to provide the information to her attorney. The court also directed DCFS to follow up with mother.

The CSW texted mother on January 7, 2020 to ask if she was available to talk, but mother did not respond. On January 13, 2020, the CSW "called, left voicemail messages and texted [mother] to inquire more about the ICWA claim." Mother did not call back, but she sent a brief text stating that she had Cheyenne ancestry through her father. She did not give any more information.

On January 16, 2020, DCFS sent partially completed ICWA notices to the Bureau of Indian Affairs, Secretary of the Interior, and federally recognized Cheyenne tribes. The notices indicated the parents' names, addresses, birth dates, and birth places, but did not provide any information about the grandparents or great-grandparents.

At the January 31, 2020 adjudication hearing, DCFS's counsel noted that ICWA notices had been sent and asked the

court to set a progress date in March or April. A hearing was set for April 1, 2020.[2]

In June 2020, mother asked the CSW whether the children could be placed with a member of her extended family. The CSW texted mother asking for names and birth dates of family members; mother did not respond.

Subsequently, DCFS reported that it had received signed return receipts from the noticed tribes, Bureau of Indian Affairs, and Secretary of the Interior, and had received a letter from the Cheyenne River Sioux Tribe stating that the children were not enrolled members of the tribe.

## C. Six-month review, ICWA finding, termination of parental rights.

Neither parent appeared at the six-month review hearing on February 8, 2021. The juvenile court found no substantial probability that the children would be returned to the parents in the next six months, terminated reunification services, and set a hearing to terminate parental rights pursuant to section 366.26.

Both parents were present at the June 7, 2021 permanency planning hearing. The juvenile court inquired whether there was any new information relevant to ICWA; none was provided. The court found that ICWA did not apply to the proceeding and terminated parental rights.

Both parents timely appealed from the order terminating parental rights.

---

[2] Due to the Covid-19 pandemic, the hearing did not go forward in April 2020 as scheduled. It ultimately was consolidated with the six-month review hearing and continued to February 8, 2021.

7

## DISCUSSION

### I.    Relevant law.

#### A.    ICWA.

ICWA was enacted " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .' [Citation.]" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 (*Isaiah W.*); see 25 U.S.C. § 1902.)  An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4); see also § 224.1, subd. (a) [adopting federal definition of "Indian child"].)

"[T]he burden of coming forward with information to determine whether an Indian child may be involved . . . in a dependency proceeding does not rest entirely—or even primarily—on the child and his or her family."  (*In re Michael V.* (2016) 3 Cal.App.5th 225, 233.)  Rather, "[j]uvenile courts and child protective agencies have 'an affirmative and continuing duty to inquire' whether a dependent child is or may be an Indian child."  (*Ibid.*; see also *Isaiah W.*, *supra*, 1 Cal.5th at pp. 9–11; § 224.2, subd. (a).)

This affirmative duty to inquire has several elements.  The statute provides that if a child is removed from his or her parents and placed in the custody of a county welfare department, the department has a duty to inquire whether a child is an Indian

8

child.  Such inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ."  (§ 224.2, subd. (b).)  The court also must make an ICWA inquiry when the parents first appear in court:  The court "shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and must require each party to complete California Judicial Council Form ICWA-020, Parental Notification of Indian Status (Cal. Rules of Court, rule 5.481(a)(2)(C)).

If the court or social worker has "*reason to believe* that an Indian child is involved in a proceeding," the court or social worker must "make further inquiry regarding the possible Indian status of the child" by, among other things, interviewing the parents and extended family members, and contacting the Bureau of Indian Affairs, State Department of Social Services, and any tribe that may reasonably be expected to have information about the child's membership, citizenship status, or eligibility.  (§ 224.2, subd. (e)(2), italics added.)  There is "reason to believe" a child involved in a proceeding is an Indian child whenever the court or social worker "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe."  (§ 224.2, subd. (e)(1).)

If the agency's inquiry creates a "*reason to know*" that an Indian child is involved, notice of the proceedings must be provided to the parent, legal guardian, or Indian custodian and the child's tribe.  (§ 224.2, subd. (f).)  There is "reason to know" a

9

child is an Indian child if any one of six statutory criteria is met—e.g., if the court is advised that the child "is an Indian child," the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).) Thereafter, the court shall confirm that the agency used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member, or eligible for membership, to verify whether the child is in fact a member or whether a biological parent is a member and the child is eligible for membership. (§ 224.2, subd. (g).) A determination by an Indian tribe that a child is or is not a member of, or eligible for membership in, that tribe "shall be conclusive." (§ 224.2, subd. (h).)

If the juvenile court finds that "proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child," the court may make a finding that ICWA does not apply to the proceedings, "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).)

### B. Standard of review.

Where, as here, the juvenile court finds that ICWA does not apply, " ' "[t]he finding implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885 [(*Austin J.*)]; see *In re D.S.* (2020) 46 Cal.App.5th 1041, 1050 [(*D.S.*)] ["[t]he juvenile court may . . . make a finding that ICWA does *not* apply because the Agency's further inquiry and due diligence was

10

'proper and adequate' but no 'reason to know' whether the child is an Indian child was discovered"].)' (*In re J.S.* (2021) 62 Cal.App.5th 678, 688.) ' "[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." ' (*In re D.F.* (2020) 55 Cal.App.5th 558, 565.)" (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.) " 'Thus, we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw.' (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.)" (*In re J.N.* (2021) 62 Cal.App.5th 767, 774.)

## II. Substantial evidence supported the juvenile court's finding that ICWA did not apply.

Mother and father urge that the juvenile court erred in finding ICWA did not apply because DCFS did not contact extended family members to inquire about possible Indian ancestry. We disagree.

### A. Substantial evidence supports the juvenile court's ICWA finding as to father.

It is undisputed that father completed and signed an ICWA-020 form in which he said he had "no Indian ancestry as far as I know." It also is undisputed that father told DCFS in August 2019 that he did not have Indian ancestry, and he confirmed this statement on the record during his first court

11

appearance on September 5, 2019. Nonetheless, the parents contend that DCFS had a duty to investigate father's possible Indian ancestry by interviewing all identified members of father's extended family, including father's mother, grandmother, and siblings, and that the juvenile court erred by finding ICWA did not apply without requiring DCFS to undertake such an inquiry.

There is a split among the Courts of Appeal as to a child welfare agency's duty to investigate a child's possible Indian ancestry where a parent denies such ancestry. Some Courts of Appeal have adopted the approach the parents advocate, concluding that even where a parent denies any Indian ancestry, section 224.2, subdivision (b) requires DCFS to inquire of a child's extended family members regarding his or her possible Indian ancestry. (See, e.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421 [although mother reported she had no Indian ancestry, the juvenile court erred by concluding DCFS had conducted an adequate ICWA inquiry because it failed to inquire of the maternal grandmother, maternal aunts, and a maternal uncle about the child's possible Indian ancestry]; *In re A.C.* (2022) 75 Cal.App.5th 1009 [although parents denied Indian ancestry, DCFS erred by failing to ask members of parents' extended family about the child's possible Indian ancestry]; *In re H.V.* (2022) 75 Cal.App.5th 433 [although mother denied Indian ancestry, DCFS had a duty to inquire of the maternal great-grandmother and maternal great-grandfather].) Other courts have reached a contrary conclusion, holding that a parent's unequivocal denial of Indian ancestry may constitute substantial evidence to support a juvenile court's finding that ICWA does not apply. (See, e.g., *In re Charles W.* (2021) 66 Cal.App.5th 483, 486–488, 490–491 [juvenile court and agency made adequate

12

ICWA inquiry where mother's counsel, in mother's presence, denied that mother had Indian ancestry]; *In re Austin J.*, *supra*, 47 Cal.App.5th at pp. 887–888 [no duty to make further inquiry regarding children's possible Indian ancestry through father where father's in-court statement and his parental notification of Indian status declaration indicated that he and his children had no Indian ancestry]; *In re A.M.* (2020) 47 Cal.App.5th 303, 323 [no need for further inquiry if no one has offered information that would give the court or agency reason to believe that a child might be an Indian child]; *In re H.V.*, *supra*, 75 Cal.App.5th 433 (dis. opn. of Baker, J.) [mother's and father's denials of Indian ancestry were substantial evidence to support juvenile court's finding that ICWA did not apply].)

We need not resolve this issue here because even were DCFS required to inquire further regarding father's possible Indian ancestry, substantial evidence supported the juvenile court's finding that that duty was satisfied in this case. While the case was pending in the juvenile court, father was given multiple opportunities to provide contact information for extended family members, but he never did so. When he was first interviewed by DCFS in late August 2019, father provided the names of his mother and stepfather, whom he said lived in Arizona, but could not provide any contact information for them. Father said he would ask them to call DCFS; they never did. Father also could not provide an address or phone number for his ex-wife or two older children.

The CSW again asked father about his extended family in October 2019. Father identified his mother, grandmother, and ex-wife, but was able to provide a phone number for only his grandmother. The phone number he provided was not in service,

13

however. And, although father said he had three living siblings, he did not provide DCFS with their contact information.[3] In short, the record does not identify any member of father's extended family for whom DCFS had contact information but did not attempt to reach.

Although father did not provide the CSW with contact information for any member of his extended family, he suggests that DCFS should have made efforts to "locate, contact, [and] interview" his parents, grandparents, and siblings because he provided their names and, in the case of his mother and stepfather, the state where they lived.[4] Father cites no authority for the proposition that DCFS's duty of inquiry includes attempting to obtain contact information for family members for whom it has only first and last names, and the case law is to the contrary. (See, e.g., *In re A.M.*, *supra*, 47 Cal.App.5th at p. 323 [although information provided by mother triggered a duty of further inquiry, agency's failure to interview maternal relatives was reasonable where mother could not provide information about maternal relatives and no maternal relative appeared at

---

[3] Father suggests on appeal that DCFS did not do enough to locate members of his extended family because the CSW "apparently did not ask Father for his parents' address in Arizona" and "apparently [did] not ask Father for his siblings' addresses or other contact information." The record does not support this inference.

[4] Moreover, even were we to agree that DCFS has a duty to attempt to locate extended family members for whom parents do not provide contact information, we cannot imagine that such an attempt would have been fruitful here, where father's parents have extraordinarily common names and father could say only that they lived somewhere in Arizona.

14

any hearing or participated in the matter]; *In re K.M.* (2009) 172 Cal.App.4th 115, 119 [where child protective agency "attempted on several occasions to elicit further information from the child's family, but was unsuccessful due to the family's hostility" toward the agency, the agency "did all that can or should be reasonably expected of it to meet its obligation to the child, to the family, to the tribes and to the court.].)

In the present case, father did not provide valid contact information for a single member of his extended family—and because no extended family member ever appeared in the action, we are not certain what more DCFS could have done to investigate father's possible Indian ancestry. We therefore conclude that substantial evidence supported the juvenile court's conclusion that DCFS conducted a "proper and adequate further inquiry" (§ 224.2, subd. (i)(2)) as to father's family.

## B. Substantial evidence supported the juvenile court's finding as to mother.

The parents also contend that DCFS did not conduct an adequate inquiry into mother's claimed Cheyenne heritage because the record contains no evidence that DCFS attempted to contact mother's father (the maternal grandfather). Again, we disagree.

Mother told the court at the disposition hearing that she might have Cheyenne ancestry through her father's grandmother (the children's maternal great-great-grandmother), whose name she did not know. Mother said her father, Jerry Ruiz, was the only member of her family who might have more information about her family's ancestry, but she did not have contact information for him. The court directed mother to try to get more information about her father's whereabouts and to give that

information to her attorney, but mother never did so. And, although DCFS tried repeatedly to contact mother through phone and text, mother did not return the phone calls and did not provide any additional information by text.

Notwithstanding mother's inability to provide DCFS with information about her extended family members, the parents contend the juvenile court should have required DCFS to attempt to contact her father or great-grandmother. We do not agree: As we have said, the statute requires DCFS to make a reasonable inquiry into the family's ancestry, but it does not require the agency to attempt to speak to extended family members for whom the parents have not provided contact information.[5] In any event, it is not clear what more DCFS could have done to attempt to contact mother's father or great-grandmother: Lacking a phone number or address for either, and without any additional family members with whom to follow up, DCFS had, as a practical matter, done all it could do to investigate mother's possible Indian ancestry. We therefore conclude that substantial evidence supported the juvenile court's conclusion that DCFS conducted an "proper and adequate further inquiry" (§ 224.2, subd. (i)(2)) as to mother's family.

The parents further contend that the notices DCFS mailed to the tribes were inadequate because they did not provide complete information (names, current and former address, birth and death dates, birth places, and tribal enrollment information) for the children's direct lineal ancestors. Not so. ICWA notice is

---

[5] As with father's parents, it is difficult to imagine that DCFS would have been able to locate mother's father in Los Angeles even had it tried to do so because his name is so common.

16

required only if after initial and further inquiries there is "reason to *know*" that an Indian child is involved in the proceeding. (§ 224.2, subd. (f), italics added.)  As we have described, there is "reason to know" a child is an Indian child if any one of six statutory criteria is met—e.g., if the court is advised that the child is a member or eligible for membership in an Indian tribe, the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possesses an identification card indicating membership or citizenship in an Indian tribe.  (*Id*., subd. (d).)  Here, none of these statutory criteria was met, and thus ICWA notice was not required.  Any insufficiencies in the notices sent, therefore, were legally irrelevant.

## DISPOSITION

The orders terminating parental rights are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, P. J.

I concur:

KIM, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18

LAVIN, J., Dissenting:

D.R. (mother) and R.R. (father) appeal from the juvenile court's orders terminating their parental rights to their infant children, A.R. and R.R. The parents argue the Department of Children and Family Services (Department) failed to comply with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related state laws implementing ICWA (Welf. & Inst. Code,[1] § 224 et seq.).

I disagree with the majority's conclusion that substantial evidence supports the juvenile court's finding that ICWA did not apply. In my view, the Department failed to conduct an adequate initial inquiry under ICWA as to both parents. Accordingly, I would conditionally affirm the orders terminating mother's and father's parental rights and remand the matter for the limited purpose of requiring the Department to comply with ICWA. I therefore respectfully dissent.

## BACKGROUND

### 1. Proceedings Leading to the Termination of Parental Rights

In September 2019, shortly after A.R. and R.R. were born, the Department filed a dependency petition because the children tested positive for amphetamine and heroin at birth. The petition alleged mother's use of illicit drugs while pregnant with the children and the parents' issues with substance abuse placed the children at serious risk of suffering physical harm (§ 300, subd.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

(b); b-1 through b4 allegations). After the detention hearing, the juvenile court found father was A.R.'s and R.R.'s presumed parent.

In January 2020, the court sustained all the petition's allegations, declared the children dependents of the court, and removed them from mother's and father's custody. The court awarded the parents reunification services.

In February 2021, the court found mother and father were not in compliance with their case plans, terminated their reunification services, and scheduled a selection and implementation hearing under section 366.26.

In June 2021, the court held the selection and implementation hearing. The court found A.R. and R.R. were adoptable, terminated mother's and father's parental rights, and designated the children's foster parents as their prospective adoptive parents.

Mother and father appealed from the orders terminating their parental rights.

## 2. ICWA Investigation

Shortly after the children were born in August 2019, the Department interviewed father. Father has four siblings: two brothers and two sisters. His father died when he was six years old, and one of his sisters recently passed away. Father provided the Department with the names of the children's paternal grandmother and paternal step-grandfather, who lived in Arizona. Father didn't have the paternal grandparents' contact information, but he told the Department he would try to obtain it.

Father also stated he was on parole and provided the Department with two possible telephone numbers for his parole officer. The Department called one of those numbers on October

11, 2019 and left a voicemail message with return contact information. Although the Department had not received a return phone call from a parole officer as of October 18, 2019, there is no indication in the record that the Department made any further attempt to contact father's parole officer.

Father told the Department in August 2019 that he had two other children, Angel Marie, born in 2001 or 2002, and Michelle Victoria, born in 2003, and provided the Department with the dates and months of their births. Father also stated that their mother, Victoria R., "had full custody of the girls through divorce Court" and provided the Department with Victoria R.'s date, month, and year of birth. Father could visit the girls every other weekend but had not seen them since prior to his last arrest about one year ago. Although father did not have a contact number or address for the girls and Victoria R., he stated the family was residing in Hemet, California. In addition, the Department had prior contact information for this family since it investigated, and closed, a 2002 allegation of emotional abuse and general neglect involving father, Victoria R., Angel Marie, and two stepchildren.

In early September 2019, father filed an ICWA-020 form on which he checked a box stating, "I have no Indian ancestry as far as I know."

Father, but not mother, appeared at the detention hearing. Father told the court that he didn't know if his or mother's families had any Indian ancestry. The court found it didn't have reason to know A.R. and R.R. were Indian children and ordered the parents to keep the Department, their attorneys, and the court aware "of any new information relating to possible ICWA status."

3

In October 2019, the Department interviewed father again. Father was on good terms with his siblings, his mother, and his grandmother. He provided a phone number for his grandmother, but the number didn't work when the Department tried to contact her. Father didn't provide contact information for any of his other relatives.

In December 2019, mother submitted an ICWA-020 form, stating she may have Indian ancestry through the Cheyenne tribe. At her first court appearance that same day, mother told the court that she has Cheyenne ancestry through her father's side of the family. When the court asked mother if she knew whether anyone in her family was a member of the tribe, mother replied, "I don't. It's on my father's side. I believe his grandmother was." Mother didn't know if her father's grandmother was still alive because she no longer spoke to her father. Mother didn't have her father's contact information, but she provided his name and stated she believed he and his grandmother, if still alive, lived in Los Angeles. Mother told the court she would try to obtain her father's date of birth and contact information. The court instructed mother to contact her relatives and ordered the Department to investigate mother's claim of Indian ancestry.

In mid-January 2020, the Department sent notices to the "Cheyenne and Arapaho Tribes of Oklahoma," the "Cheyenne River Sioux Tribe," and the "Cheyenne-Arapaho Tribes of Oklahoma." The notices included: (1) each child's name and date of birth; (2) mother's name, contact information, and date and place of birth and a statement that mother claimed ancestry from the noticed tribes; and (3) father's name, contact information, and date and place of birth. The notices did not include names or any

4

other information for any of the family's extended relatives, listing their identification as "unknown." The court found the Department's notices were proper.

The Department received return receipts from the tribes, the Bureau of Indian Affairs, and the Secretary of State. The Cheyenne River Sioux Tribe responded to the Department's notices. The tribe's enrollment specialist conducted an enrollment check and found that mother, father, and both children were not enrolled in the tribe.

In late January 2020, the Department reported it had called mother, left her voicemails, and texted her asking for more information about her claim of Cheyenne ancestry. Mother never returned the Department's calls, but she responded through text message that she has Cheyenne ancestry through her father. She didn't provide any other information. Nothing in the record indicates the Department otherwise tried to locate or contact mother's father or her father's grandmother.

In its selection and implementation report filed in May 2021, the Department didn't provide any new information about its investigation into the family's ICWA status. The Department urged the court to make ICWA findings before deciding on a permanent plan for the children.

At the June 7, 2021 selection and implementation hearing, the court found ICWA did not apply to the children's proceedings. During that hearing, mother and father requested that A.R. and R.R. be placed with father's ex-wife—Victoria R.— and mother's counsel told the court that he has "the information for the court if the court does need that information."

## DISCUSSION

To effectuate ICWA, state law imposes on the Department and the juvenile court an affirmative and continuing duty to inquire whether a child in a dependency proceeding "is or may be an Indian child." (§ 224.2, subd. (a); *In re Michael V.* (2016) 3 Cal.App.5th 225, 233.) The duty to inquire "begins with initial contact [citation] and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.* (2020) 58 Cal.App.5th 275, 290, citing § 224.2, subd. (a).) "[T]he burden of coming forward with information to determine whether an Indian child may be involved and [the extent of] ICWA notice required in a dependency proceeding does not rest entirely—or even primarily—on the child and his or her family." (*Michael V.*, at p. 233.)

Under its "duty of initial inquiry," the Department must "make meaningful efforts to locate and interview … 'extended family members' " when it takes a child into temporary custody. (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552–553 (*Y.W.*).) To that end, the Department must ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child," and the reporting party whether the child is or may be an Indian child. (§ 224.2, subd. (b).) Extended family members include adults who are the child's stepparents, grandparents, aunts, uncles, brothers, sisters, nieces, nephews, and first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).) The court is also required, at the first appearance of each party, to "ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child." (§ 224.25, subd. (c).) To meet its

6

obligations under ICWA, the Department "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status." (Cal. Rules of Court, rule 5.481(a)(5).)

The court may find ICWA doesn't apply to a child's proceeding if it finds the Department's duty of inquiry has been satisfied and there is no reason to know that child is an Indian child. (§ 224.2, subd. (i)(2); Cal. Rules of Court, rule 5.481(b)(3)(A).) We review the court's ICWA findings for substantial evidence. (*In re E.W.* (2009) 170 Cal.App.4th 396, 404.) As I will explain, the Department failed to satisfy its duty of inquiry as to both parents.

As to mother, the Department concedes "it had a duty of inquiry to interview the maternal grandfather and any other available extended maternal relatives given that mother claimed she had possible Cheyenne ancestry and then identified the maternal grandfather and his grandmother at court on December 11, 2019." The Department also acknowledges that although it "made some effort at following up with mother the following month to inquire about her ICWA claim, the record is silent on whether the agency made any additional efforts thereafter to speak with her extended relatives."

The Department's inquiry into mother's claim of Cheyenne ancestry was inadequate. The Department was aware that mother claimed Cheyenne ancestry through her father's side of the family. Although mother didn't have contact information for her father or personal information for her father's grandmother, she provided her father's name and the city where she believed he and his grandmother, if still alive, lived (Los Angeles).

7

Nothing in the record indicates the Department tried to locate or contact mother's father, or to identify, contact, or locate her father's grandmother, after mother identified them as relatives who potentially had information pertaining to her claim of Cheyenne ancestry. As the petitioning agency, it was incumbent upon the Department "to make a meaningful effort to locate and interview extended family members" to investigate mother's claim that she has Cheyenne ancestry stemming from her father's side of the family. (*In re K.R.* (2018) 20 Cal.App.5th 701, 709 (*K.R.*).) The Department failed to satisfy that duty in this case.

The Department also didn't satisfy its duty of inquiry as to father. While father denied knowing of any Indian ancestry in his family, that didn't relieve the Department of its duty to try to locate and contact the children's extended paternal relatives. As several courts have observed, parents often "may not know their possible relationship with or connection to an Indian tribe." (*Y.W.*, *supra*, 70 Cal.App.5th at p. 554; see, e.g., *In re S.R.* (2021) 64 Cal.App.5th 303, 314 ["parents apparently had no idea of their family's connection to the Yaqui tribe of Arizona, even though the children's great-grandmother was a member"]; *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 787 ["Oral transmission of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's identification of the family's tribal affiliation is not accurate."]; *In re Breanna S.* (2017) 8 Cal.App.5th 636, 650 [" 'parents may be unsure or unknowledgeable of their own status as a member of a tribe' "], disapproved on other grounds by *In re Caden C.* (2021) 11 Cal.5th 614, 637, fn. 6.) Accordingly, "ICWA and state law place the duty

8

[to inquire] with the child protective agency in the first instance, not the child or his or her parent, to determine whether additional information exists that may link a child with Indian ancestry to a federally recognized tribe." (*Elizabeth M.*, at p. 787.) Thus, "[n]othing in section 224.2, subdivision (b), relieves the Department of its broad duty to seek … information [about a family's ancestry] from 'all relevant' individuals … simply because a parent states on the ICWA-020 form … 'I have no Indian ancestry as far as I know.'" (*Y.W.*, at p. 554, citation omitted.)

Here, father provided the Department with the names of several of his family members, including his mother, his step-father, and his grandmother, and he told the Department he still has good relationships with his surviving siblings. While father gave the Department an inactive phone number for his grandmother, nothing in the record shows the Department followed up with father to find a working phone number for her or otherwise made any effort to locate and contact her or any of father's other relatives.

In addition, the Department should have followed up on obvious leads and sources to obtain contact information for father's extended family members, including his two eldest daughters. For example, it should have attempted to interview father's ex-wife, Victoria R. Indeed, the Department had prior contact information for this family since it investigated a previous abuse and neglect allegation involving father, Victoria R., and Angel Marie. Father also stated that his eldest daughters and Victoria R. lived in Hemet, and father and Victoria R. had been involved in family court litigation. To the extent the Department could not locate Victoria R. from public sources of

9

information or its own records, mother's counsel appeared ready and able to provide the court with that information at the June 7, 2021 hearing. And although the Department had not received a return phone call from father's parole officer—another potential source of information concerning father's family—as of October 18, 2019, there is no indication that the Department made any further attempt to contact the officer.

In sum, the Department failed to comply with its duty "to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have" as to A.R.'s and R.R.'s possible Indian status. (*K.R.*, *supra,* 20 Cal.App.5th at p. 709.) And where, as here, a child protective agency has not complied with its inquiry duty, I would not defer to the juvenile court's ICWA finding. Under section 224.2, subdivision (i)(2), an ICWA finding is entitled to substantial evidence review only if the juvenile court first ensures that "proper and adequate further inquiry and due diligence as required [by the statute] have been conducted and there is no reason to know whether the child is an Indian child." (See *In re N.G.* (2018) 27 Cal.App.5th 474, 482–485 [rejecting agency's argument that substantial evidence supported court's ICWA findings and remanding matter for ICWA compliance because the agency did not document what efforts, if any, it made to ask extended family members about the child's possible Indian ancestry]; *K.R.*, at p. 709 ["the court has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices as legally adequate without doing so"].)

For these reasons, I would conditionally affirm the court's orders terminating mother's and father's parental rights and

10

remand for full compliance with the inquiry provisions of ICWA and related California law.


LAVIN, J.